**In re GULF CONSOLIDATED SERVICES, INC., Debtor.**

**Bankruptcy No. 86–08347–H4–11.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Oct. 3, 1988.

Sheinfeld, Maley & Kay, Houston, Tex., for debtor.

MEMORANDUM OF DECISION

WILLIAM R. GREENDYKE,
Bankruptcy Judge.

Sheinfeld, Maley & Kay ("the law firm") is a partnership engaged in the practice of law in Houston, Texas. The law firm represents the Debtor, Gulf Consolidated Services, Inc. This Chapter 11 case commenced in the Fall of 1986 and, less than one year after its filing, the law firm and Debtor were able to obtain confirmation of a plan of reorganization in July, 1987. On September 4, 1987, the law firm filed its Application for Allowance of Attorney Fees and Reimbursement of Out-of-Pocket Expenses for the Period September 25, 1986 Through July 31, 1987. The Application was reviewed by the Estate Administrator's office, submitted to chambers in late January of 1988, and was set for hearing by the court on March 22, 1988. No other parties in interest either objected to the Fee Application or requested any hearing.

At the hearing, the court related to members of the law firm several concerns which had been raised by the Estate Administrator's report, as well as several concerns of the court separate and apart from those of the Estate Administrator.

The court allowed the law firm's Application for Allowance of Fees and Reimbursement of Expenses to be supplemented in order to respond to the expressed concerns. Informally, the law firm requested the opportunity to present additional evidence or oral argument at a subsequent hearing. We consider the initial application for compensation to have been comprehensive; we also consider the Supplement to have been responsive to the questions raised at the March 22, 1988 hearing. We see no need for further hearing. If the information or further explanation was not capable of being reduced to writing after the March 22, 1988 hearing, we do not think subsequent hearings are justified. The court has the independent authority and responsibility to determine the reasonableness of all requests for payments of attorneys' fees. This responsibility exists whether or not any objections or requests for hearing have been filed with

regard to a particular fee application. *See In re Pettibone Corp.,* 74 B.R. 293, 299–300 (Bankr.N.D.Ill.1987). We also conclude that the court has the ability to rely upon its own knowledge of customary rates and its own experience in determining the reasonableness and necessity of fees, without the need for independent evidence. *See Matter of Pothoven,* 84 B.R. 579 (Bankr.S. D. IA 1988); *In re Farwell,* 77 B.R. 198, 201 (N.D.Ill.1987); and *Brown v. Culpepper,* 561 F.2d 1177 (5th Cir.1977).

At the hearing on March 22, 1988, the court questioned the following items relating to the level of expenses and fees for which compensation was sought by the law firm:

1. Secretarial overtime;
2. Overtime utilities;
3. Delivery charges;
4. Undocumented travel expenses;
5. "Miscellaneous expenses";
6. Meals (not out of town); and
7. Hourly rates for attorney time.

Several other items concerning the law firm's fees and expenses were discussed at the March hearing; however, we also expressed our inclination at the March hearing not to take any action with regard to those additional areas. Therefore, this memorandum of decision is devoted only to those items listed above.

DISCUSSION

We will deal with each of the enumerated concerns in numbered paragraphs corresponding to the list of items set forth above.

1. Secretarial overtime. The law firm has requested approval of a total of $5,345.14 in secretarial overtime, claiming that it is the firm's policy in connection with its representation of all clients (not just debtors in bankruptcy) that secretarial overtime should be borne by the client. Notwithstanding this policy, and according to the Supplement to the Fee Application, the law firm has encountered resistance from the Bankruptcy Courts of the Southern District of Texas in the form of disal-

lowance of secretarial overtime in a number of cases over the past two years. We view secretarial overtime as a item of overhead; therefore, it is not recompensable as an out-of-pocket expense. *See In re First Software Corp.*, 79 B.R. 108, 120 (Bankr.D. Mass.1987); *In re Pacific Express, Inc.*, 56 B.R. 859, 866 (Bankr.E.D.Cal.1985).

■ 2. Overtime utilities. The law firm has requested reimbursement of $675.89 attributable to overtime utilities. This expense ostensibly was incurred by members of the firm working after 10:00 p.m. or before 7:00 a.m. during the week, or at certain times during weekends. Again, we view overtime utilities as an item of overhead which is not reimbursable. Further, it does not seem unreasonable to assume that we could be provided with some sort of written evidence of the overtime utility charges in the form of a statement for expenses incurred by the law firm to the building, landlord, or utility company in connection to the utility overtime expenses. No such documentation was presented.

■ 3. Delivery charges. The law firm has requested reimbursement of $6,402.09 for overnight or messenger delivery charges. The primary justification set forth for these delivery charges was to the effect that the debtor was directed by another Bankruptcy Judge (in orders setting emergency hearings) to serve creditors with pleadings by messenger service and/or by overnight delivery. No specific orders, dates of orders, or docket numbers were furnished in the Supplement to the Application. The law firm did, however, after review of its backup records and court orders, estimate that approximately $6,168.00 was attributable to court order for, or authorization of, utilization of messenger or overnight delivery services. After review of the file in the main case, we have determined that the Bankruptcy Judge or Judges who handled this case prior to confirmation in many instances *specifically* ordered or authorized the use of messenger and/or overnight delivery services. We therefore will approve these expenses. The remaining overnight or

messenger delivery charges sought to be reimbursed are minor in comparison and we find them to be reasonable. They will be approved.

■ 4. Travel expenses. The law firm has sought reimbursement of travel expenses in the total amount of $2,623.48. The Supplement to the application recites that these expenses are attributable to trips involving deposition sessions in Cincinnati, Ohio, and trips to New York City to deal with a proposed lender/secured creditor of the debtor. In support of this claim for reimbursement, the law firm has attached to its Supplement various receipts and in-house travel expense reports. The original Application is for fees and expenses incurred from September 25, 1986 through July 31, 1987. The Supplement to the application does not extend this time frame. The Order authorizing employment of the law firm recites that it is effective as of the date of the commencement of the case—September 17, 1986. While the case was commenced by the filing of an involuntary petition under Chapter 11, the debtor filed its own voluntary petition and consented to entry of an order for relief on September 25, 1986. The first entry on the law firm's statements submitted as documentation for its Application is dated September 2, 1986.

The first travel expense report concerns $400.00 claimed for a trip to New York City which occurred on August 7, 1986—before the case was filed and well before the Order authorizing employment was entered. There are no correlative explanations in the Application, the Supplement, or the documentation which indicate the purpose of the trip or the need for the trip. It will be disallowed for want of explanation or justification.

The second travel expense report is for $601.86 claimed in connection with a trip to Denver, Colorado on September 9–10, 1986. The travel expense report appears to bear the client name "Continental" and the trip (per the travel expense report) is for the purpose of a creditor's committee meeting. Reference to the court's docket in our case again indicates the involuntary petition had

not yet been filed and the law firm had not yet been employed as of the date of this September 9, 1986 trip. Similarly, there is no service entry for "trip to Denver" reflected in the law firm's statement in connection with Gulf Consolidated Services. This expense will be disallowed.

Third, there is a charge card receipt indicating an expense of $481.33. It cannot be determined from the charge slip when the expense was incurred, for what purpose it was incurred, or in connection with what client. It will be disallowed.

The remaining expenses incurred by two of the law firm's lawyers on July 7 and July 8, 1987, in the respective amounts of $628.08 and $610.48, in connection with a deposition trip to Cincinnati, Ohio, will be allowed in full.

■ 5. Miscellaneous charges (including service fees). The law firm has sought reimbursement of the sum of $670.55 for miscellaneous charges (including service fees). They have represented in the Supplement to the Application that $210.00 of this amount reflects the out-of-pocket costs by the firm for payment of statutory witness fees. This amount will be allowed. The balance, $460.55, will be disallowed because of the failure to itemize and attribute a particular expense to a particular item or purpose.

■ 6. Non-business trip meals. The debtor has claimed $111.70 for non-business trip meals. That is to say, the debtor has claimed this amount for food items consumed during meetings with the debtor or other parties in interest, with the reasoning that it would be better to continue negotiations and otherwise to avoid interruptions that would be counterproductive to the representation. We disagree with the articulated rationale and would attribute such expenses to the firm's overhead. We therefore disallow the claim for reimbursement.

7. Attorney's fees. At the hearing on March 22, 1988, the court announced its basic approval of the work that had been done by debtor's counsel, and the rates which had been charged, with only two exceptions. The Fee Application contained requests for payment of fees to partner Leonard M. Parkins for 88.6 hours in the year 1986 at the rate of $235.00 per hour, and for 73.3 hours in 1987 to be compensated at the rate of $250.00 per hour. Similarly, the firm requested compensation for three hours of time devoted by partner Robbin R. Dawson in 1987 at the rate of $200.00 per hour. Lawyer Dawson is apparently a business lawyer, as opposed to a "bankruptcy" lawyer by speciality. At the March 22, 1988 hearing, the court announced its intention to compensate Mr. Parkins at the rate of $150.00 per hour for 1986 services, and at the rate of $160.00 per hour for 1987 services. We also announced our intention to compensate Lawyer Dawson at the rate of $150.00 per hour.

*Matter of First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.1977) articulated the three-step process which the court must follow in determining the reasonableness of attorneys fees. In essence, the court is to ascertain the amount of time involved and the rate at which the services should be compensated. These amounts are multiplied to arrive at the "lodestar", which may then be adjusted by consideration of the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). *See Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575, 583 (5th Cir.1980) (Copper Liquor II). The following is this Court's *First Colonial* analysis as it applies to the challenged attorneys fees.

a. Amount of Time. This court has not expressed any concern regarding the number of hours which either Mr. Parkins or Mr. Dawson have billed in the case, nor is it concerned that the hours involved here are duplicative or for non-legal work. The hours requested are approved in full as follows:

| L. Parkins | 1986 | 88.6 hours |
|---|---|---|
| L. Parkins | 1987 | 73.3 hours |
| R. Dawson | 1987 | 3.0 hours |

b. Rate of Compensation. It is the reasonableness of the rate of compensation which is of concern to this court as indicated to the parties at the March 22, 1988

hearing. The response by the law firm was quick and, as represented by the Supplement to the Application, comprehensive. Its fees charged in this case, as well as to other debtors in bankruptcy, are alleged to be comparable to fees charged to other clients of the firm outside of bankruptcy. Further, the law firm has argued that its billing rates are in line with the billing rates of comparable law firms practicing bankruptcy law in other major metropolitan areas. The Supplement to the Application states in part:

> SM & K provides top quality service at cost which it believes to be no more, and often less, than can be offered by virtually any other firm. It offers the services at rates which reflect the fact that the services can be provided better, faster and more efficiently than might be found elsewhere.... In addition, a survey of billing rates at 47 law firms in major metropolitan areas taken from [a] magazine is attached as Exhibit "D" which indicates that billing rates in excess of $200.00 per hour are commonplace.

Supplement to Application for Allowance of Attorneys' Fees and Reimbursement of Out-of-Pocket Expenses for the Period September 25, 1986 through July 13, 1987, pp. 17–18.

Exhibit "D" attached to the Supplement to the Application indicates the fees charged by various firms in thirteen cities in the United States. Included in those cities are both Dallas and Houston. In Dallas, the range of fees charged for partners by three very large and reputable law firms ranges from a high of $250.00 per hour to a low of $145.00 per hour for the year 1988. In Houston, the 1988 figure for partners in three respectable, fairly large firms ranges from a low of $150.00 per hour to a high of $250.00 per hour. In both cities, the high-end rates were both approximately $25.00 per hour lower in 1987. The exhibits submitted as part of the Supplement to the Application support and coincide with the court's perception of the market for attorney's fees, both at present, and in prior years.

Section 330 of the Code establishes the parameters within which a Bankruptcy Judge exercises his or her discretion in determining reasonable compensation by requiring the Judge to consider "the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under [Title 11, U.S.C.]...." The "cost of comparable services" standard enables the court to focus on a range of fees which are compensatory and realistic in a rapidly changing market for legal services.

The market for "comparable" legal services has margins of reasonableness just as any other market. There is a low end and a high end. It would be unreasonable and contrary to congressional intent and national reorganization policy to force compensation of bankruptcy professionals to be at levels below or limited to the low end of the spectrum of legal fees. Nor could Congress have intended that fees in bankruptcy should be at a level automatically or markedly higher than the "cost of comparable services."

As indicated in the legislative history to 11 U.S.C. § 330, the House and the Senate differed in the weight to be given "the cost of comparable services." The House Report expressed concern that fee awards, historically low in bankruptcy cases because of a belief that the estate should be conserved for a greater return to creditors, would be an impediment to the development and maintenance of a competent bankruptcy bar.

> Bankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those who could not find other work and those who practice law only occasionally almost as a public service. Bankruptcy fees that are lower than fees in other areas of the legal profession may operate properly when the attorneys appearing in bankruptcy cases do so intermittently, because a low fee in a small segment of a practice can be absorbed by other work. Bankruptcy specialists, however, if required to accept

fees in all of their cases that are consistently lower than fees they could recieve elsewhere, will not remain in the bankruptcy field.

H.R.Rep. No. 595, 95th Cong., 1st Session 329–30, *reprinted in* 1978 U.S. CODE CONG. & ADMIN. NEWS 5787, 6286. The Senate, pointing to the 1938 reorganization reforms which were designed in part to curb excessive fees, disagreed.

> In the years since [the 1938 reforms] the bankruptcy bar has flourished and prospered, and persons of merit and quality have not eschewed public service in bankruptcy cases merely because bankruptcy courts, in the interest of economy in administration, have not allowed them compensation that may be earned in the private economy of business or the professions. There is no reason to believe that, in generations to come, their successors will be less persuaded by the need to serve in the public interest because of stronger allures of private gain elsewhere.

S. Rep. No. 989, 95th Cong., 2d Sess. 40, *reprinted in* 1978 U.S. CODE CONG. & ADMIN. NEWS 5826. The Senate Report also asserted that in a bankruptcy case

> [t]here is inherent a "public interest" that "must be considered in awarding fees," *Massachusetts Mutual Life Insurance Co. v. Brock*, 405 F.2d 429, 432 (C.A.5, 1968), cert. denied, 395 U.S. 906 [89 S.Ct. 1748, 23 L.Ed.2d 220] (1969). An allowance is the result of a balance struck between moderation in the interest of the estate and its security holders and the need to be "generous enough to encourage" lawyers and others to render the necessary and exacting services that bankruptcy cases often require, *In re Yale Express System, Inc.*, 366 F.Supp. 1376, 1381 (S.D.N.Y.1973).

S. Rep. No. 989, 95th Cong., 2d Sess 40, *reprinted in* 1978 U.S. CODE CONG. & ADMIN. NEWS 5826. The Congressional Record Statements reflect that Congress ultimately rejected the argument made by the Senate; the standard of compensation "adopted [was that contained] in H.R. 8200 as passed by the House...." 124 Cong. Rec. H11089, *reprinted in* 1978 U.S. CODE CONG. & ADMIN. NEWS 6436, 6442. The legislative history goes on to state that

> the policy of this section [330] is to compensate attorneys ... serving in a case under title 11 at the same rate as the attorney ... would be compensated for performing comparable services other than in a case under title 11. Contrary language in the Senate report accompanying S. 2266 is rejected, and *Massachusetts Mutual Life Insurance Company v. Brock*, 405 F.2d 429, 432 (5th Cir.1968) is overruled. Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.

124 Cong. Rec. H11089, *reprinted in* 1978 U.S. CODE CONG. & ADMIN. NEWS 6436, 6442.

Notwithstanding this last sentence, it is not reasonable to believe that Congress intended to disavow any "public interest" (e.g. conservation of estate assets) in the award of fees in bankruptcy cases.[1] Indeed, the public interest is served by the court's supervision of the employment and compensation of counsel for debtors in possession. While "notions of economy of the estate" no longer exist to bind the court in determining fees, Congress has in effect required bankruptcy judges to weigh the "public interest" in the calculation of fees by compensating counsel only for "actual, necessary services." 11 U.S.C. § 330(a)(1).[2] The determination of whether the services

---

**1.** We doubt Congress in 1978 foresaw the breathtaking development of bankruptcy practice we have all witnessed in the last ten years. This explosive growth in practice, partly attributable to the unfortunate economic downturn in Texas and other states in this Circuit, has led to a surge in fees in many instances. In effect, when the Code was drafted, the concern was to make sure bankruptcy fees kept pace with fees in other areas of the law. Now, ten years later, in the eyes of many it appears that the bankruptcy bar no longer needs Congress' help.

**2.** "It is not now, nor has it ever been, the law that an attorney will be compensated for rendering unnecessary and inappropriate services." *In re Shades of Beauty, Inc.*, 56 B.R. 946, 952 (Bankr.E.D.N.Y.1986).

rendered were in fact necessary and appropriate serves as a threshold to entitlement to fees. Reasonable compensation is then determined by reference to the factors enumerated in 11 U.S.C. § 330(a)(1), including the "cost of comparable services" standard.

 This Court therefore concludes public interest still plays a part in a determination of fee awards in bankruptcy cases—if not from the viewpoint of "economy of the estate," than at least inherently from the standpoint of the Code's requirements for court supervision of fees, and the public's perception of the integrity and fairness of our bankruptcy system and courts. We also conclude that while the "cost of comparable services" should not serve as an absolute cap on fees awardable to bankruptcy counsel, it is a factor susceptible of being given tremendous weight in the court's discretion in making a determination of "reasonable" compensation.

 The law firm has sought to have Mr. Parkins' services compensated at a final rate of $250.00 per hour. It is this court's perception that $250.00 per hour for legal services is a great deal of money.[3] As of the date of this writing such a degree of compensation can be and should be awarded only to lawyers of exceptional ability and expertise, for work of exceptionable value.[4] Our finding, based on the docket, the application and its supplement (and the attachments to both), and the record, is that the range of fees for skilled lawyers of partner level (i.e. the "cost of comparable services") during the applicable time periods was $150.00 to $225.00 per

hour. We are not satisfied by the Application that the services rendered and the fees requested by Mr. Parkins and Mr. Dawson in 1986 and in 1987 are entitled to the level of compensation requested. This is a matter within our discretion; we have carefully analyzed the fee application and our determination is that Mr. Parkins be awarded reasonable compensation at the rate of $175.00 per hour for 88.6 hours expended in 1986, and $190.00 per hour for 73.3 hours expended in 1987. Assuming the law firm had a reasonable basis for the difference in rates of compensation sought for Dawson and Parkins, the court finds Mr. Dawson will be reasonably compensated at the rate of $150.00 per hour for three hours expended in 1987. Based on the foregoing, the lodestar for these fees is as follows:

| L. Parkins | 1986 | 88.6 hours × $175/hr | = | $15,505 |
| L. Parkins | 1987 | 73.3 hours × $190/hr | = | $13,927 |
| R. Dawson | 1987 | 3.0 hours × $150/hr | = | $ 450 |

The court's analysis in this regard has involved consideration of the skill required to perform the legal service properly, the customary fee for the services, and the experience, reputation, and ability of the attorneys.

c. Adjustment of the Lodestar. This court finds no basis upon which to support an adjustment of the lodestar. This was a relatively straight-forward Chapter 11 case with no unusual or particularly difficult issues. The case was prosecuted diligently and resulted in a confirmed, liquidating plan in less than one year after filing.

---

**3.** One lawyer in the firm, Arthur L. Moller, billed .3 hours in 1986 at the rate of $250.00 per hour. Given Judge Moller's status as a former Bankruptcy Judge, his reputation as a bankruptcy scholar and the respect he commands among members of the bar, the court felt that the rate of $250.00 per hour is justified in his case.

**4.** We do not intend to be critical of Mr. Parkins. The court is aware of his reputation and experience. We are also aware of other members of the Bankruptcy Bar who practice in the Southern, Northern and Western Districts of Texas, both on the debtor side of the docket, as well as on the creditor side. Mr. Parkins is 39 years old (per the law firm's application) and has been practicing since 1976. If he is entitled to the

rates requested, we can scarcely comprehend the level of compensation of a thirty-year lawyer or a former judge. Notwithstanding the foregoing comparison, the proper benchmark (and the one we utilize here) is to compare the partner level fees requested in the application with rates being charged by other counsel (both bankruptcy and non-bankruptcy practitioners) of similar experience and expertise in matters of similar complexity (whether or not the matter is of a litigation nature). In other words, the customary rate is not necessarily what Mr. Parkins charges, it is what the court perceives to be the reasonable value of the services in the market place, with due deference to the cost of comparable services.

There were no significant time limitations (other than those present in any reorganization) imposed on the attorneys which required additional attorney assistance or which precluded other employment. The case was not "undesirable" such that the law firm's involvement damaged its community reputation. Finally, the compensation rate does not affect the overall award in a manner which makes it dissimilar to awards in other Chapter 11 cases.

In closing, this court notes that although the Fifth Circuit has specifically endorsed the concept that a court does not abuse its discretion by paying today's rates for yesterday's services because of the deprivation of the recipient of the value of the use of the money pending payment, we find this principle to be inapplicable in this case. *See Graves v. Barnes,* 700 F.2d 220, 223 (5th Cir.1983). The original Application for Allowance of Attorneys' Fees filed by the law firm reflect that a prepetition retainer in the amount of $336,839.99 was paid. As is SMK's practice, expenses and fees are billed *and paid* against the retainer, post petition, prior to application, and without court approval. *Cf. In re Chapel Gate Apartments, Ltd.,* 64 B.R. 569 (Bankr.N.D.Tex.1986). The proposed form of order submitted with the original fee application asks us to ratify and confirm the prior draws against the retainer, thereby giving us basis to find there has been no "deprivation" in this case. The court reserves the *Chapel Gate* question for another day.

A separate form of order shall be entered consistent with this decision.

## ORDER AWARDING COMPENSATION

On this date this Court entered its Memorandum of Decision with respect to Sheinfeld, Maley & Kay's Application for Allowance of Attorney Fees and Reimbursement of Out-of-Pocket Expenses for the Period September 25, 1986 through July 31, 1987. Based on the discussion in the Memorandum of Decision it is

ORDERED that Sheinfeld, Maley & Kay is awarded compensation as follows:

EXPENSES;
| | |
|---|---|
| Amount Requested | $ 81,978.56 |
| Disallowed Secretarial Overtime | $( 5,345.14) |
| Disallowed Overtime Utilities | ( 675.89) |
| Disallowed Travel | ( 1,483.19) |
| Disallowed Miscellaneous Expenses | ( 460.55) |
| Disallowed Meals (Not out of Town) | ( 111.70) |
| Allowed Expenses | $ 73,902.09 |

FEES:
| | |
|---|---|
| Amount Requested | $191,840.50 |
| Fee Reduction (L. Parkins 1986) | ( 5,316.00) |
| Fee Reduction (L. Parkins 1987) | ( 4,398.00) |
| Fee Reduction (R. Dawson 1987) | ( 150.00) |
| Allowed Fees | $181,976.50 |

Total compensation and reimbursement due under this Order is $255,878.59. Pursuant to the request of Sheinfeld, Maley & Kay, and with the reservation of the *Chapel Gate* issue as set forth in the Memorandum of Decision issued concurrently with this Order, the prior application of the Chapter 11 retainer to fees and expenses is ratified and approved in the amount of $73,902.09 for expenses and $181,976.50 for fees.