**In re TEMPLE RETIREMENT COMMUNITY, INC., Debtor.**

**Bankruptcy No. 87–60663–C.**

United States Bankruptcy Court,
W.D. Texas,
Waco Division.

Feb. 5, 1989.

---

Michael R. Rochelle, Rochelle & Balzersen, Dallas, Tex., for debtor.

George E. Henderson, Fulbright & Jaworski, Austin, Tex., for indenture trustee First RepublicBank Temple, N.A.

## ORDER AWARDING ATTORNEY'S FEES

LEIF M. CLARK, Bankruptcy Judge.

This Order addresses the application of the law firm of Rochelle & Balzerson, counsel for the debtors, for compensation. After a hearing, the court took the application under advisement to further review the application in detail and to consider the propriety of the hourly rates requested. Upon consideration thereof, the court finds and concludes, for the reasons set out in this Order, that the fees should be awarded in the amount requested, without reduction or diminution.

## BACKGROUND FACTS

The debtor, doing business as a retirement community known as the Village on Canyon Creek, had fallen on difficult times due in large part to the misfeasance (or malfeasance) of its original developer and management entity. AmeriCare developed the Village with money raised from a bond issue. Most of the bondholders were individuals, many of whom had invested their life savings in these bonds. The bond indenture trustee held a first mortgage on the development. The Village's residents were solicited with a guarantee of life care

in exchange for a rather substantial front-end deposit, which the Village promised to refund should a resident choose to leave. AmeriCare failed to honor this obligation, however, and further was unable to maintain an occupancy sufficiently high to service the bond debt, which fell into default. The retirement community's board of directors fired AmeriCare, and cast about for a buyer who would put enough capital into the community to prevent catastrophe for bondholders and residents alike. In late 1985, the board of directors engaged Rochelle & Balzerson, a Dallas firm which has for many years specialized in bankruptcy, to assist in the reorganization effort. The firm put together a process for soliciting and evaluating potential buyers, working with the residents' council, the indenture trustee, and an *ad hoc* bondholders' committee. Eventually, the firm negotiated an agreement with LeGan, Inc., an entity out of Denver, Colorado, to manage and eventually acquire the facility via a carefully timed bankruptcy filing. The process required careful coordination with nervous residents, jittery and fractious bondholders, an equally jittery bank serving as indenture trustee, querulous trade creditors, and an often difficult and occasionally overbearing purchaser. The firm successfully orchestrated a bankruptcy which, in just four months, resulted in a confirmed plan. Post-confirmation, it successfully resolved a dispute with the State Board of Insurance that threatened to undo the reorganization before it even closed.

The application accurately and best summarizes the accomplishments of the firm:

> ... The Debtor's facility could continue to function only so long as the residents were confident that progress was being made on solving the Village's problems. Had the residents lost that confidence, they would have quickly voted with their feet; a significant drop in occupancy might have rendered the Village unreorganizable, given that its most precious asset is its residents....

The plan was confirmed 117 days after the filing of the case, 63 days before the end of the exclusivity period.

This would be a sizable case in any court, with more than $20 million in total claims against the estate.... pre-petition planning succeeded in assuring that no trade or utility creditors existed at filing, thereby simplifying the plan and keeping the Debtor's trade credit unimpaired. Applicant Firm also succeeded in creating an environment hostile enough to the Debtor's original promoter, Americare, Inc., to convince it not to seek any share of the assets coming from the sale of the facility, even though it asserted a $1.9 million claim....

The two major creditor groups in this case were the bondholders and the current and former residents. It appears that the bondholders will receive more than the 60% dividend estimated in the disclosure statement.

Current and former residents, being unsecured creditors, will receive considerably more under the plan than they would have in a liquidation.... the residents have ... improved their position by now having a claim against LeGan, which is a solvent, experienced, and capable operating entity.[1]

With reference to both bondholders and residents, it must be said that the results which they enjoy under the plan are considerably better than were foreseen eighteen months ago.

The firm, in its application, seeks compensation of $74,472 and reimbursement for expenses totalling $12,417.88 covering a period of just over six months. A total of 517.90 hours were expended, at an overall average blended rate of $143.80 per hour. The following billing rates are requested in the application:

| | |
|---|---|
| Michael R. Rochelle | $195.00/hr. |
| Stephen T. Hutcheson | $125.00/hr. [1987]; $145.00/hr. [1988] |
| Patrick J. Neligan | $110.00/hr. |
| Pedro V. Hernandez, Jr. | $85.00/hr. |

---

1. What is not said in the Application is that current residents have a far greater assurance of a place to live now than they did a year before the filing, a matter of no small moment to men and women in their final years with limited resources (both physical and financial) to move elsewhere.

All travel was billed at one-half the hourly rate of the attorney doing the traveling. Routine services such as reviewing claims, drafting and presenting administrative motions, and maintaining routine communications with the client were handled mostly by Messrs. Hernandez and Hutcheson. Mr. Rochelle was the principal architect of the plan and disclosure statement and conducted the critical negotiations with LeGan, the indenture trustee, and the residents' council.

## ANALYSIS

In this decision, this court addresses a number of issues common to all fee applications as well as one issue endemic to this fee application. We turn first to the general issues.

A. *The necessity for independent review by the court*

■ At the outset, this court holds with numerous other courts that it "has the independent authority and responsibility to determine the reasonableness of all fee requests, regardless of whether objections are filed." *Matter of Pothoven*, 84 B.R. 579, 583 (Bankr.S.D.Ia.1988); *In re Pettibone Corp.*, 74 B.R. 293, 299 (Bankr.N.D. Ill.1987); *In re NRG Resources, Inc.*, 64 B.R. 643, 650 (W.D.La.1986); *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 585 (Bankr.D.Utah 1985); *In re Wilson Foods Corp.*, 36 B.R. 317, 320 (Bankr.W.D.Okla. 1984); *see also* 2 *Collier on Bankruptcy*, para. 328.02 at 328–8 (15th ed.1987); Lavien, *Fees as Seen from the Bankruptcy Bench*, 89 Com.L.J. 136–138 (March 1984). This duty arises in part from the very wording of the statute, which specifies that, after notice and a hearing,

> the court *may* award ... (1) *reasonable* compensation for *actual, necessary* services rendered by [the professional] ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and (2) reimbursement for *actual, necessary* expenses.

11 U.S.C. § 330(a)(1). The award of fees is discretionary, bounded by (1) whether the compensation is reasonable and (2) whether the services were actually rendered and were necessary. *In re Nucorp Energy, Inc.*, 764 F.2d 655, 658 (9th Cir.1985). Compensation of professionals employed by the debtor is always an appropriate province for judicial scrutiny "to protect the creditors of the estate and the debtor against overreaching by an officer of the court who is in a peculiarly advantageous position to impose on both the creditors and his client." Bankr.R. 2017, Advisory Comm. Note (1987); 2 *Collier on Bankruptcy*, para. 329.02 (15th ed.1987). "The numerous limitations imposed by the Bankruptcy Code upon compensation of court-appointed counsel ... are designed to insure the highest standards of ethical conduct and minimize the overhead expenses which can easily deplete a debtor's estate." *Matter of Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1255 (5th Cir.1986).

A bankruptcy court is also charged with evincing an "over-arching policy of avoiding the waste of the debtor's estate." *In re Wonder Corp. of America*, 82 B.R. 186, 191 (D.Conn.1988), citing *Continental Vending Machine Corp*, 543 F.2d 986, 994 (2d Cir.1976) and *In re United Merchants and Manufacturers, Inc.*, 674 F.2d 134, 140 (2d Cir.1982).

> The bankruptcy judge can and must apply his own expertise *sua sponte*, if necessary, in order to be fair to both counsel and creditors because, in the final analysis, either excess generosity or extreme miserliness in allowing fees will reflect in the *public perception* of the system.

Lavien, *Fees as Seen from the Bankruptcy Bench*, 89 Com.L.J. at 138. A recent decision out of the Southern District of Texas adds that

> Congress has in effect required bankruptcy judges to weigh the "public interest" in the calculation of fees by compensating counsel only for "actual, necessary services." 11 U.S.C. § 330(a)(1).... [P]ublic interest still plays a part in a determination of fee awards in bankruptcy cases ... at least inherently from the standpoint of the Code's requirements

for court supervision of fees, and the public's perception of the integrity and fairness of our bankruptcy system and courts.

*In re Gulf Consolidated Services, Inc.,* 91 B.R. 414, 419–20 (Bankr.S.D.Tex.1988).[2]

The duty to serve this "public interest" is imposed in this Circuit upon all court-appointed counsel. *See Matter of Consolidated Bancshares, Inc.,* 785 F.2d at 1255.[3] The reality, however, is that many cases have only one court-appointed counsel, the debtor's attorney. Even in cases served by committees, however, the court-appointed lawyers, "sharing the mutual goal of securing approval for their fees, enter into a conspiracy of silence ... [best] characterized ... as a 'massive backscratching exercise.'" *Id.* What is more, the debtor is often not likely to act as a brake on fees, as it often matters very little to a debtor whether his attorney's fees are large or small since it will be paid out of assets which, in any event, would normally be consumed in distribution. *See In re Olen,* 15 B.R. 750 (Bankr.E.D.Mich.1981). With the advent of the U.S. Trustee system in this district, the court anticipates that that office will adopt as a priority the routine review of fee applications in chapter 11 cases, though the statute itself makes the U.S. Trustee's active participation technically discretionary. *See* 28 U.S.C. § 586 (1986).[4] If the court fails to review fee applications *sua sponte,* the public interest will in all likelihood go begging.

Bankruptcy courts also have a duty to preserve the integrity of the court itself. The debtor-in-possession (as well as the trustee and the creditors' committee) retains counsel only with court approval. 11 U.S.C. § 327. The court-appointed counsel are then paid only upon application to the court. Bankr.R. 2016. The money is transferred almost literally over the judge's signature on a court order approving the fees. *See In re Wildman,* 72 B.R. 700, 705 (Bankr.N.D.Ill.1987). The affixing of a judge's signature to an order is not an empty formality. It is a judicial confirmation that the fees in question are in fact reasonable and do in fact represent compensation for actual and necessary services, measured against the various factors set out in the case law. *In re Manoa Finance Co., Inc.,* 853 F.2d 687, 690 (9th Cir.1988). *See Matter of Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1257 (5th Cir.1986). Because fees can be paid only upon court order, the court which signs that order must therefore be prepared to accept responsibility for its judicial actions by independently determining that court authorization for the fees is warranted. *See In re National Paragon Corp.,* 87 B.R. 11, 13 (E.D.Pa.1988); *In re Benassi,* 72 B.R. 44 (D.Minn.1987); *Cohen & Thiros v. Keen Enterprises,* 44 B.R. 570, 574 (N.D.Ind.1984), *citing In re Meade Land and Development Co.,* 527 F.2d 280, 284 (3rd Cir.1975).

The local rules for this district affirmatively adopt the Code of Professional Responsibility as adopted by the State Bar of Texas as standards of professional conduct in this district. Rule 200–4, Local Rules for the Western District of Texas (1982).

---

**2.** Judge Greendyke added in a footnote that "when the Code was drafted, the concern was to make sure bankruptcy fees kept pace with fees in other areas of the law. Now, ten years later, in the eyes of many it appears that the bankruptcy bar no longer needs Congress' help." *Id.* at 419 n. 1.

**3.** Vigilance is required by and among court-appointed counsel in particular to enforce the standards of the Code.... At the least, they should inform the court in writing, as and when interim fee applications for other parties are filed, that hey have reviewed such applications carefully, indicate whether or not such applications are reasonable and whether they are based on any impermissible grounds.

... we believe some such vehicle is necessary to screen and control any possible abuses of compensation and to compel court-appointed counsel to perform their fiduciary duty. *Id.*

**4.** each United States Trustee ... shall ... supervise the administration of cases ... by, whenever the United States trustee deems it to be appropriate ... monitoring applications for compensation ... filed under section 330 of title 11 and, whenever the United States trustee deems it to be appropriate, filing with the court comments with respect to any such applications.
28 U.S.C. § 586(a)(3)(A) (1986).

All lawyers seeking fees in this district are expected to comply with Disciplinary Rule 2–106, which prohibits the collection of a fee in excess of a reasonable fee. State Bar Rules, art. 10, § 9, DR 2–106, *reprinted at* Tex.Govt.Code Ann., Title 2, Subtitle G, Appendix (Vernon 1988). The standards for reasonableness set out in that rule track the twelve factors set out in *First Colonial Corp. v. American Benefit Life Insurance Co. (In re First Colonial Corp.)*, 544 F.2d 1291, 1298–99 (5th Cir. 1977), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). If the fees requested are in fact excessive as tested against the disciplinary rules, a court has no business whatsoever in contributing its judicial imprimatur to the award of those fees. For this reason as well, a court must independently review fee applications *sua sponte*.

This court recognizes that Section 330(a) commences with the phrase "after notice and a hearing," which triggers the operation of Section 102(1), permitting the entry of an order without an actual hearing if no objections have been filed. *See Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1202 (5th Cir.1981) ("the judge must hold an evidentiary hearing if there are any disputed factual issues"). The statute does not *compel* the award of fees absent objection, however. It merely *authorizes* the award.[5] The judge still enjoys the independent discretion to award only so much in fees as he or she determines is reasonable compensation for actual, necessary services rendered. Holding a hearing is simply the most efficient way to make that determination. It affords the attorney an opportunity to respond to questions the court might have and in the long run saves the court's and the lawyer's time.[6] For these reasons,

this court has declined adopting the laissez-faire approach suggested in *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569 (Bankr.N.D.Tex.1986), even though that approach technically complies with the Code's requirements.

Consistent with the foregoing policy, this court conducted an extensive hearing on the fee application submitted by Rochelle & Balzerson in this case.

B. *The standards applicable to review of fee applications*

Section 330(a)(1) imposes a two-step analysis. As a threshold matter, the court must first satisfy itself that services rendered were in fact necessary and appropriate. Then the court must find that the compensation requested for those services is reasonable, with reference to the factors delineated in Section 330(a)(1). *In re Gulf Consolidated Services, Inc.*, 91 B.R. 414, 420 (Bankr.S.D.Tex.1988).

1. Determining that services were actual and necessary

With other courts that have considered the question, this court requires attorneys to set out their services as rendered in sufficient detail for the court to determine what work was done, by whom it was done, how long it took to do, whether there has been any duplication of effort, and what results were achieved. In this way, the court is given the data with which to determine that the compensation requested is for actual and necessary services. 11 U.S.C. § 330(a)(1); *Matter of Pontiac Hotel Associates*, 92 B.R. 715, 716 (E.D.Mich. 1988) ("requests for fees [must] be carefully itemized in order that the bankruptcy court may eliminate excessive charges, or

---

**5.** After notice ... and a hearing, ... the court *may award* ...
11 U.S.C. § 330.

**6.** Holding hearings on applications for interim compensation also benefits attorneys. It alerts attorneys early on to any difficulties the court might have with their such items as their hourly rates, the manner in which they are staffing a case, the manner in which they are documenting their services, or the master whom they are serving. Should these issues be left to be raised

by the judge for the first time at the hearing on the final application for compensation (long after interim compensation has been paid, booked by the firm, and distributed to partners), the firm could find itself facing an unpleasantly large and equally unexpected disgorgement order. *See In re Kendavis Industries International, Inc.*, 91 B.R. 742, 762 (Bankr.N.D.Tex.1988) (court-ordered disgorgement of approximately $2 million in fees previously paid in interim compensation).

wasteful services and expenditures of professional time"). Generally, this requires each attorney who works on the case to maintain detailed, contemporaneous time records in sufficient detail to accurately re-create for the court what the firm in fact did for the client. "The detailed fee applications enable the bankruptcy court to fulfill its obligations to examine carefully the requested compensation in order to ensure that the claimed expenses are justified." *In re Nucorp Energy, Inc.*, 764 F.2d 655, 658 (9th Cir.1985); *see also In re Beverly Mfg. Corp.*, 841 F.2d 365, 370 (11th Cir. 1988); *In re Westside Creek Ltd. Partnership*, 93 B.R. 177, 180 (Bankr.E.D.Ark. 1988) (citing numerous authorities); *Matter of W.T. Grant Co.*, 85 B.R. 250, 261 (Bankr.S.D.N.Y.1988) (applying similar requirements in a case under the former Bankruptcy Act); *In re C & J Oil Co., Inc.*, 81 B.R. 398, 403 (Bankr.W.D.Va.1987); *Matter of Pothoven*, 84 B.R. 579, 583–84 (Bankr.S.D.Ia.1988); *In re Baldwin–United Corp.*, 79 B.R. 321, 337 (Bankr.S.D.Ohio 1987); *In re Pettibone Corp.*, 74 B.R. 293, 301 (Bankr.N.D.Ill.1987); *In re S.T.N. Enterprises*, 70 B.R. 823, 832–33 (Bankr.D.Vt. 1987); *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 582 (Bankr.D.Utah 1985).

Attorneys who practice regularly in the Western District of Texas are already aware of the standards courts of this district regularly impose for fee applications. The following comments are intended to be instructive rather than exhaustive.

■ Services should be reported to the nearest tenth of an hour, and must not be lumped together. *In re Westside Creek Ltd. Partnership*, 93 B.R. 177, 180 (Bankr. E.D.Ark.1988). It is not sufficient to simply describe a given service as "telephone call with bank counsel," for example, without indicating in some way the function or substance of the telephone call. *In re Pettibone Corp.*, 74 B.R. at 301, *Matter of Pothoven, supra* at 584; *In re Westside*

*Creek Ltd. Partnership, supra* at 180. Counsel should supplement their time records with written narrative that places the services rendered in context so that the court can evaluate the necessity of their rendition. *In re Pettibone Corp.*, 74 B.R. at 300.

■ Attorneys are expected to exercise billing judgment. They should therefore exclude from their applications, prior to their submission, time spent which, upon reflection, is excessive, redundant, unjustifiable, or otherwise unnecessary. This represents no more than the selfsame billing judgment attorneys regularly impose upon themselves at the "edit" stage of the billing process before submitting a bill to their private clients. *Matter of Pothoven, supra*, citing *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Examples of billing judgment include, by way of example only, billing travel time at one-half their normal hourly billing rate, refraining from billing routine matters at a senior attorney's premium rate when the service could (or should) have been performed by a junior attorney at that attorney's lower rate, and billing an amount of attorney time appropriate to the service rendered. When possible, firms are expected to use paralegals and other staff to perform mundane (albeit necessary) tasks such as the preparation of exhibits for trial or the compilation of ballots. *Matter of Pothoven*, 84 B.R. at 585; *In re Amatex Corp.*, 70 B.R. 624, 627 (Bankr.E.D.Pa. 1985). Attorney conferences are not prohibited, but they must be justified, as they are conducted at a high cost to the estate. *See In re Pettibone Corp.*, 74 B.R. at 303.[7] When attorneys fail to exercise this sort of billing judgment in advance, the court is constrained to play the role of "client," "objecting" to excessive fees which overstep the "actual and necessary" standard imposed by Section 330(a)(1). *See Pontiac Hotel Associates*, 92 B.R. at 716.[8]

---

[7]. One legitimate use of such conferences, for example, might be the structuring of the plan and the development of the disclosure statement, tasks which usually require contemporaneous input from all professionals involved in the case.

[8]. The court also recommends that fee applications be accompanied by an affidavit from the *client*, be that the debtor's estate, the trustee, or the chairman of the creditors' committee, confirming that person's review of the application prior to filing and affirming that the fee request-

■ The fee application of Rochelle & Balzerson satisfies this court's requirements for adequate documentation of fees and expenses requested. Each attorney's time has been broken down into the small enough "chunks" to portray the discreet task being performed, and has been reported to the nearest tenth of an hour. The services were actually performed and the application demonstrates their necessity. Travel time was uniformly billed at half the regular billing rate, and duplicative work has (to the extent there ever was any) evidently been excised from the bill. Mr. Rochelle has delegated to Mr. Hernandez many of the more mundane tasks, and directed Mr. Hutcheson to handle all but the most critical hearings. So-called "supervisory time," a necessary component of the practice for law partners, has been excised from the bill, having been appropriately absorbed into the billing rate itself as part of the firm's overhead. The fee application meets the threshold determination imposed by Section 330(a)(1)—the services for which compensation is requested were actually rendered and were both necessary and appropriate.

### 2. Determining whether the compensation is reasonable

In applying the reasonableness factor of Section 330(a)(1), there are two controlling legal issues. First is the extent to which the *First Colonial* decision has continuing vitality in deciding the reasonableness of fees requested in Code cases. Second is whether the average billing rates in a given community dictate the standard for reasonable fees to be awarded under Section 330(a)(1).

#### a. *The continuing vitality of First Colonial*

We turn first to the *First Colonial* question. That decision held that the twelve

factors previously set out in *Johnson v. Georgia Highway Express, Inc.* must also dictate the award of fees in bankruptcy cases. *Georgia Highway* involved a fee award under a fee-shifting statute in an EEOC case. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). In 1977, the Fifth Circuit correctly adopted the *Georgia Highway* standard for use in bankruptcy cases arising under the Bankruptcy Act because awards under that Act were to made "at the lower end of the spectrum of reasonableness." *First Colonial Corp. v. American Benefit Life Insurance Co. (In re First Colonial Corp.)*, 544 F.2d 1291, 1299 (5th Cir.1977), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *accord, Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1201 (5th Cir. 1981). However, Judge King (then Randall) observed in *U.S. Golf* that,

> We note that this consideration does not affect the determination of attorneys' fees under the new Bankruptcy Act [sic], 11 U.S.C. § 101 *et seq.*, for the Bankruptcy Reform Act of 1978 specifically provides that compensation for attorneys shall be based, *inter alia*, on "the cost of comparable services other than in a case under this title.." 11 U.S.C. § 330(a)(1) (1979).

*Matter of U.S. Golf Corp.*, 639 F.2d at 1201.

The new Bankruptcy Code expressly overruled pre-Code caselaw that defined trustees and debtor's counsel as public officers who were not entitled to compensation at the same level as they might receive in private employment and that forced the judge to focus solely on economy of administration and conservation of the estate in awarding fees to these "public officers." [9]

---

ed is, in his or her opinion, reasonable and justified (i.e., represents actual and necessary services rendered).

**9.** The legislative history states that

The compensation is to be reasonable, for actual necessary services rendered, based on the time, the nature, the extent, and the value of the services rendered, and on the cost of comparable services other than in a case un-

der the bankruptcy code. The effect of the last provision is to overrule *In re Beverly Crest Convalescent Hospital, Inc.,* [548 F.2d 817 (9th Cir.1977)], which set an arbitrary limit on fees payable, based on the amount of a district judge's salary, and other similar cases that require fees to be determined based on notions of conservation of the estate and economy of administration. If that case were allowed to stand, attorneys that could earn

The blind application of standards designed for use under the Bankruptcy Act can thus not be justified under the Bankruptcy Code's compensation scheme.

It is clear that in adopting § 330 Congress intended a retreat from doctrines which strictly limited fee awards under § 241 [of the Bankruptcy Act] to less than attorneys might have received for services of the same professional quality in non-bankruptcy cases.

*In re Manoa Finance Co., Inc.,* 853 F.2d 687, 689 (9th Cir.1988); *In re Nucorp Energy, Inc.,* 764 F.2d 655, 659 (9th Cir.1985).

What is more, it is equally irresponsible to give blanket adherence to judicial precedents such as *Georgia Highways* which have their genesis in fee-shifting statutes:

[t]here are ... some notable differences between § 330 and the typical fee-shifting statute. Congress has expressed its intent that bankruptcy compensation be commensurate with that earned in comparable nonbankruptcy cases, while the usual fee-shifting statute is not "intended to replicate exactly the fee an attorney would earn through a private fee arrangement with his client." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). In addition, the source of fees in bankruptcy cases is unique, and § 330 has no parallel to the condition that fees will be awarded only to a prevailing party.... [W]hile awards under fee-shifting statutes are by their nature contingent, the risk of nonpayment in bankruptcy cases generally arises only in the event of insufficient funds in the estate to pay for the services rendered.

*In re Manoa Finance Co., Inc.,* 853 F.2d at 690, 691. To the extent the *First Colonial* standards undercut the overriding function of assuring payment commensurate with what attorneys are receiving in nonbank-

ruptcy cases, they have thus been statutorily repudiated.

By the same token, however, the factors enumerated in *First Colonial* are not without utility. Significantly, they track the provisions set out in the disciplinary rule which prohibits attorneys from charging or collecting excessive fees:

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. *Factors to be considered as guides in determining the reasonableness of a fee* include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

Texas Code of Professional Responsibility, DR 2–106(B)(3), State Bar Rules, art. 10, § 9 *reprinted at* 3 Tex.Govt.Code, Title 2, Subtitle G, appendix (Vernon 1988). The standards are thus still useful in prevent-

---

much higher incomes in other fields would leave the bankruptcy arena ... the bankruptcy field would be occupied by those who could not find other work and those who practice bankruptcy law only occasionally almost as a public service. ... Bankruptcy specialists ... if required to accept fees in all

of their cases that are consistently lower than fees they could receive elsewhere, will not remain in the bankruptcy field.

H.R.Rep. No. 595, 95th Cong, 2d Sess 329–330 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6286.

ing the award of excessive fees, regardless in what context the fees have been incurred, which is precisely consistent with this court's obligation to the public to assure that it not knowingly or unknowingly participate in the violation of the disciplinary rules by authorizing fees in excess of "reasonable fees," as measured against the standards set out in the disciplinary rules.

The use of the *First Colonial* standards in this context is also consistent with and furthers the congressional intent implicit in the statute:

> We think that in enacting that section [Section 330(a)(1)] Congress did not intend to authorize higher compensation than attorneys would receive for comparable non-bankruptcy services.

*In re Manoa Finance Co., Inc.,* 853 F.2d at 690.

The true point of departure from pre-Code law is the directive to assure comparability, while still retaining sufficient control to prevent excessive fee awards. The statute itself suggests simply looking to comparable non-bankruptcy services, in large part because of Congress' intentions, clearly expressed in the legislative history, to break with the then-prevalent trend of courts to "low-ball" fee allowances in bankruptcy. *See* 124 Cong Rec H11091 (daily ed. Sept. 28, 1978, remarks of Rep. Edwards). An overstrict reading, however, may tend to lead back to the very evil Congress intended to prevent, if the attorney hired is a bankruptcy specialist whose practice is restricted to a limited market and whose services therefore command a premium. If "reasonable compensation" means "not excessive," as it does in the disciplinary rule, then the focus on comparability should turn to the community or marketplace within which the services were rendered.

> The court must be guided not merely by what rate the applicant charges its non-bankruptcy clients, but by what range of rates is charged by attorneys of comparable competence for comparable services in the comparable community or marketplace.

*In re Gulf Consolidated Services, Inc.,* 91 B.R. at 420; *In re Shades of Beauty, Inc.,* 56 B.R. 946, 952 (Bankr.E.D.N.Y.1986). Thus, the appropriate question may not always simply be: "What do you charge your nonbankruptcy clients?" In many cases, the court should also ask: "What is the range of rates charged by attorneys of comparable competence for comparable services in the comparable community or marketplace?"

### b. *The relevant community or market for testing comparability*

All of which brings us to the second legal issue affecting the reasonableness of fees requested. How does one properly define the appropriate community for purposes of reviewing comparable services? The community whose standard is applied to attorneys' fees in most civil litigation is normally presumed to be the local community in which the services are rendered. *See* Texas Code of Professional Responsibility, DR 2–106(B)(3), State Bar Rules, art. 10, § 9, *reprinted at* 3 Tex.Govt.Code, Title 2, Subtitle G, appendix (Vernon 1988) ("factors to be considered as guides in determining the reasonableness of a fee include ... (3) the fee customarily charged in the locality for similar legal services"). *First Colonial* somewhat more broadly directs the court to consider "the customary fee" and "awards in similar cases." *In re First Colonial Corp.,* 544 F.2d at 1299. Many bankruptcy cases are often more regional or even national than they are local in scope, so that looking solely to the local community's range of rates would impose an unnecessarily parochial cap on the case. *See In re Public Service Co. of New Hampshire,* 86 B.R. 7, 11 (Bankr.D.N.H.1988). In addition, bankruptcy is sufficiently specialized that a firm with the skills necessary to meet the needs of a particular debtor might not be available in the local community. In this case, for example, the debtor required the services of a bankruptcy specialist with the expertise to move a complicated case through the bankruptcy system quickly and efficiently. The complexities of the case justified hiring a bankruptcy specialist with a national reputation, but the venue

for the case was clearly Waco, Texas. Limiting the "lodestar" to that customarily awarded in the Waco–Temple–Killeen market would have effectively deprived the debtor its choice of counsel. While it may well be that there are firms in that local market who could have handled the case, it cannot be denied that the Dallas firm the debtor chose achieved an extraordinarily favorable result for the estate with a minimum of litigation, and did so in a remarkably short period of time.

A firm may be justified in recovering their own normal rate in a given case, as opposed to the local rate in the city where the case is pending, when the circumstances of the case justify bringing in outside counsel, as was done here. *In re Public Service Co. of New Hampshire*, 86 B.R. 7, 11 (Bankr.D.N.H.1988) (Los Angeles bankruptcy firm of national reputation representing major public utility company in New Hampshire); *In re Frontier Airlines*, 74 B.R. 973, 977 (Bankr.D.Colo.1987) (New York counsel in a major air line case filed in Denver, Colorado); *Matter of Baldwin–United Corp.*, 36 B.R. 401, 403 (Bankr.S.D. Ohio 1984) (major Los Angeles firm represented corporate debtor in a highly complicated case then pending in Cincinnati, Ohio); *In re Atlas Automation, Inc.*, 27 B.R. 820, 822 (Bankr.E.D.Mich.1983) (regional firm with bankruptcy expertise took case in Flint, Michigan). The Sixth Circuit has said that "... courts are free to look to a national market, an area of specialization market, or any other market they believe appropriate to fairly compensate particular attorneys in individual cases." *Louisville Black Police Officers Organization, Inc. v. City of Louisville*, 700 F.2d 268, 278 (6th Cir.1983). With Bankruptcy Judge Yacos, this court does not intend this finding to augur an empty-headed approach to fees. *In re Public Service Co. of New Hampshire*, 86 B.R. at 10 n. 4 ("bankruptcy cases are to be administered as economically as possible"). Not every case warrants going outside the local community for representa-

tion.[10] When the nature of a given case in fact justifies the retention of out-of-town counsel, however, local rates should not operate as a limiting factor in determining the reasonableness of the base fee sought. *Id.* Moreover, even if the billing rates themselves are justified, the total bill must *itself* be reasonable:

> The regular hourly rates simply do not become *ipso facto* final fee awards in this court. Retention of attorneys at high hourly rates is based not only upon the assumption that the attorneys billing at such rates have the necessary experience and competence to handle complex matters, but also upon the further assumption that attorneys billing at such high rates can normally perform their duties in fewer hours than less experienced attorneys who may bill at a lower rate.
>
> ...
>
> True economy of administration in a reorganization case must be determined not by hourly rates *per se* but rather by the overall "bottom line," i.e., the total hours expended to hopefully accomplish a successful reorganization. ... the *total cost* to the estate in terms of *total dollars* will normally be lower in the first instance notwithstanding the higher hourly rates.

*Id.* at 11, n. 7.

■ The facts of this case justified the retention of Rochelle & Balzerson, warranting this court to look to the "area of specialization" market within which that firm operates to evaluate the reasonableness of the fees charged. Moreover, the overall amount sought, as measured against the amount involved and the results achieved also satisfies the "bottom line" test suggested in *Public Service Co. of New Hampshire*. By these standards, Rochelle & Balzerson's fees are well within the range of reasonableness.

**10.** Many has been the case filed in the Waco division, for example, that involved the reorganization of businesses running the gamut from bus companies through farm machinery manu-

facturers through one of the largest Arabian horse farms in the world—all competently handled by counsel from within the division.

## C. *A final note on delay in awards*

The court is concerned that counsel has had to wait a long time for this decision. The delay has penalized the firm, which would otherwise have had the use of the money awarded for the past number of months (the debtor escrowed the funds necessary to pay these fees many months ago). *See Graves v. Barnes*, 700 F.2d 220, 223 (5th Cir.1983).[11] To compensate for that delay, the court deems it appropriate to award the firm, in addition to its fee and expenses, interest on the total of that sum from and after April 5, 1988 through the date of entry of this order, at the rate of 8.5%, a rate which this court finds approximates the rate such funds could have earned in a certificate of deposit for the term during which this decision has been pending.

So ORDERED.

---

11. The concept of compensation for delay in receipt of payment is founded on the principle that "payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable." *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C.Cir.1980) (en banc).
*Graves v. Barnes*, 700 F.2d 220, 223 (5th Cir. 1983).