**In re PROPERTY COMPANY OF AMERICA JOINT VENTURE, Debtor.**

**Bankruptcy No. 389–33637–HCA–11.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Jan. 26, 1990.

D.M. Lynn, Robert Feldman, for WGM.

Andrew Jillson, Dallas, Tex., for PCA Partners.

Deirdre Ruckman, Dallas, Tex., for PCA, Inc.

Harold Marshall, Dallas, Tex., for VMS/PCA Ltd. Partnership.

Joseph Wielebinski, Dallas, Tex., for Dan Lain, Chapter 11 Trustee.

MEMORANDUM OPINION

HAROLD C. ABRAMSON, Bankruptcy Judge.

CAME ON for consideration the Combined Application of Weil, Gotshal & Manges for Compensation as Counsel for Jack R. Stone, Jr., Court Appointed CEO and as Special Counsel for Dan Lain, Trustee ("Application"). On December 5, 1989, the court conducted a hearing on the Application. After hearing WGM's presentation and the objections by Partners and PCA, the Court took the matter under advisement for additional review.

This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). After reviewing WGM's Application, affidavits, objections, and relevant authorities, the court awards WGM $236,169.00 in professional fees and $13,129.60 in expenses incurred in performing services. This memorandum opinion constitutes findings of fact and conclusions of law under Bankruptcy Rule 7052 although written in narrative form.

I.[1]

Property Company of America Joint Venture (the "Venture"), the debtor, sprung to

---

**1.** This section addresses the general background of the case. Although it extends further than

life July 1, 1988, for the purpose of acquiring, developing, and managing multifamily residential projects. PCA Partners Limited Partnership, a real estate management company, and VMS/PCA Limited Partnership, a resourceful real estate development company, each had a fifty percent venture interest. Partners contributed assets and existing debt. VMS arranged and guaranteed a $10,000,000 revolving line of credit and was to provide additional credit enhancement of $75,000,000. VMS also guaranteed a $15,000,000 loan from MBank (Dallas) to PCA, Inc. as part of the arrangement to form the Venture. Partners was the managing venturer and acted under the supervision and direction of a Joint Venture Management Committee composed of one representative each from Partners and VMS. The Venture commenced development of properties in six states and undertook management of more than 19,000 multi-family residential units. The honeymoon ended in early Spring of 1989 when disputes erupted over the Venture's business plan and day-to-day operations which resulted in a series of skirmishes between the venturers.

VMS alleged that Partners repudiated its contractual obligations and breached fiduciary duties owed to the Venture. The most serious allegation was that Partners completely failed to plan for the Venture's critical financial needs. On May 25, 1989, VMS filed suit against Partners in federal court in Chicago (the "Chicago Action") seeking, among other things, to restrain Partners from harming the venture. On May 26, 1989, after a lengthy hearing attended by VMS and Partners, the Honorable Marvin E. Aspen, United States District Judge, entered a Temporary Restraining Order. The Order prohibited Partners from taking any action which would interfere with or alter any contract, agreement, or arrangement between the Venture and

any third party. Judge Aspen also directed the parties to negotiate among themselves to resolve the issues involved in the lawsuit and to work together in good faith to secure any additional capital needed by the Venture. Judge Aspen scheduled a preliminary injunction hearing for June 15, 1989.

The venturers' negotiations proved unsatisfactory. Partners filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code on June 15, 1989, one and one-half hours before the hearing on VMS's motion for preliminary injunction. Partners simultaneously filed an involuntary petition under Chapter 11 of the United States Bankruptcy Code against the Venture. Partners' filings stayed the Chicago Action.

VMS took immediate action upon receiving notice of the bankruptcy filings. VMS filed an Emergency Motion to Modify Automatic Stay to permit the federal court in Chicago to resolve the dispute. On June 15, 1989 at 5:00 p.m., this court conducted a hearing on VMS' emergency motion. The hearing immediately signaled hostility and mistrust between the two venturers. The Venture lacked leadership or direction, as the individual venturers had focused their energies on litigation efforts.

The Venture also displayed signs of financial jeopardy. Funds were immediately needed to continue the estimated $250,000,000 work in progress and meet the Venture's 800 employee payroll. Additionally, the Venture had several projects and option contracts which needed immediate attention by decision making persons to avoid severe losses.

The court seized upon the warring venturers' impasse, and with the venturers' input, devised a tie-breaker mechanism to preserve the estate. The court invoked 11 U.S.C. § 1107[2] to restore stability to the

---

necessary to determine the propriety of WGM's Application, it provides insight into the pressures of the situation faced by the professionals.

**2.** 11 U.S.C. § 1107(a)

Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties except the duties as specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter. (emphasis supplied).

Venture rather than ordering the appointment of a Trustee or Examiner by the United States Trustee. The court prescribed that the Venture employ a disinterested business consultant[3] whose purpose was to focus the Venture's energies on the business exigencies. The consultant would serve as interim Chief Executive Officer and exercise business judgment to resolve any business decisions where the venturers could not agree. The court directed the venturers to begin considering a qualified business person to fulfill the tie-breaker role and continued the automatic stay until further hearings on June 21, 1989.

At the June 21, 1989 continued hearing, the court declined to permit VMS to proceed with the Chicago Action in lieu of using the business consultant. The court denied VMS' motion without prejudice and converted the hearing into an emergency hearing on the retention of Jack R. Stone, Jr. ("Stone") as the Venture's interim Chief Executive Officer/Tie–Breaker. The parties outlined Stone's role with court approval. Stone would review the operations and financial condition of the Venture, oversee all Venture operations, and act in a tie-breaking, supervisory capacity. The venturers consented to the mechanism and the court approved Stone's retention and permitted him to employ WGM as counsel.

Stone and WGM immediately began the work of guiding the Venture with a comprehensive investigation of the Venture's operations and financial condition. Stone and WGM salvaged several option contracts expiring on June 23, 1989. WGM engaged in extensive negotiations with the sellers of the soon to expire contracts and potential lenders. WGM prepared Temporary Restraining Orders under 11 U.S.C. § 105 in case the negotiations fell apart or time ran out. The court conducted an emergency hearing on extending the option contracts and granted approval on the terms and conditions negotiated by the parties.

After the initial frenzy, Stone stabilized the Venture by encouraging cutbacks in operations and other cost reduction measures. The tie-breaker mechanism continued to be successfully employed in ensuing matters between the venturers. Problems persisted with the Venture's banking relationships and work-in-progress. Some of the properties under construction were deteriorating from weather exposure, vandalism, and theft. Some lenders refused to extend further credit and began foreclosure discussions. Stone recognized these problems and recommended emergency measures to avoid further deterioration. WGM attorneys conducted arbitration to allow the venturers to discover their differences and to encourage them to move forward in a businesslike manner.

Although the tie-breaker mechanism tempered the venturers' immediate thirst for litigation, VMS requested the court to conduct a trial on the involuntary petition filed by Partners which was scheduled for July 31, 1989. The court conducted a lengthy pre-trial conference to pursue settlement and promote alternatives.

At the beginning of the July 31, 1989 hearing, VMS announced its consent to entry of an order for relief under Chapter 11 of the United States Bankruptcy Code. The court granted VMS' motion to appoint a Chapter 11 Trustee. The United States Trustee appointed Dan Lain who employed WGM to represent him as his special counsel because WGM was "up to speed" and "there was not time for a new counsel to learn the ropes."

On July 31, 1989, the court also conducted a hearing on VMS' Emergency Motion to Sell Assets outside a plan of reorganization to a newly created entity controlled by VMS. PCA and Partners objected to the sale. VMS put on evidence to establish the merit of its offer, the emergency condition giving rise to the necessity of a sale, and its financial ability to consummate the proposed transaction. Messrs. Lain and Stone testified as to the business aspects of the sale. After hearing the testimony, the court denied VMS' motion without prejudice due to deficiencies in proof and the court's concern for the protection of credi-

---

3. *See Matter of Gaslight Club, Inc.,* 782 F.2d 767 (7th Cir.1986).

tors.[4] The court indicated that it would consider future motions to sell or plans of reorganization upon satisfactory evidence on an expedited basis.

The warring venturers returned to the bargaining table to pursue Chapter 11 solutions. WGM attorneys negotiated, on behalf of Lain, a procedure for the sale of a majority of the Venture's assets. The court approved the procedure at an expedited hearing on August 21, 1989, but admonished the parties that it would not approve the sale of a majority of the Venture's assets unless the sales complied with Fifth Circuit standards.[5]

WGM took the lead in preparing a case for the sale of a majority of the Venture's assets. The procedure approved by the court envisioned a competitive bidding process. Lain sent copies of the sales procedure to parties identified as potential purchasers. Lain, through his general counsel, Decker, Hardt, Kopf, Harr, Munsch & Dinan P.C., contacted parties identified as potential purchasers. Lain entertained inquiries by all interested parties and evaluated all proposals. The two venturers' affiliates submitted the most promising proposals. Property Company of America Management, Inc. expressed an interest in purchasing the Venture's interest in certain management contracts. VMS Main Street Development Limited Partnership expressed an interest in purchasing the Venture's interest in the hard assets. WGM assisted Lain in "round-the-clock" negotiations to sell Venture assets to the affiliates. The negotiations culminated in agreements for sale by Lain to the venturers' affiliates, subject to due diligence and court approval. WGM prepared and filed motions to sell assets to the prospective purchasers on August 23, 1989. The motions were set for hearings on August 31, 1989, and September 8, 1989. Notice of the hearings, with a copy of the motions for sale, was mailed to all creditors.

Eight creditors filed objections to the proposed sales. WGM and Lain met with the objectors to negotiate resolutions. The negotiations cured all objections without court involvement. WGM prepared an extensive case in support of the sale. WGM supplemented the evidence with a brief thoroughly analyzing the standards announced in *Braniff* and *Continental Air Lines*. The court heard testimony from eight witnesses and considered numerous documents introduced as a part of the record. The court approved the sale to the venturers' affiliates, finding that exceptional circumstances merited the sales outside a plan.[6]

---

**4.** The court cited cases such as *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935 (5th Cir. 1983) and *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.),* 780 F.2d 1223 (5th Cir.1986) when it denied VMS' motion.

**5.** *Braniff, supra* and *Continental Air Lines, supra* (a Judge determining a § 363 application must expressly find that the evidence presents a good business reason to grant the application). *See also Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063 (2d Cir.1983) (the sale of substantially all of the debtors assets outside a plan is controlled by the "articulable business justification" test). *Lionel* lists seven factors for consideration:
1. The proportionate value of the asset to the estate as a whole;
2. The amount of elapsed time since the filing;
3. The likelihood that a reorganization plan would be proposed and confirmed in the near future;
4. The effect of the disposition on future plans of reorganization;

5. The proceeds to be obtained from the disposition *vis-a-vis* any appraisals of the property;
6. Whether the disposition is by sale, use, or lease; and finally and perhaps most important,
7. Whether the asset is increasing or decreasing in value.
*Lionel,* 722 F.2d at 1071.

**6.** This court strictly adheres to *Braniff* and *Continental* and will approve the sale of substantially all of an estate's assets in seldom circumstances. Beside the problems associated with *sub rosa* arrangements which lock in, and disenfranchise creditors, the sales often serve as a vehicle for secured lenders to "launder" their collateral of undesirable attributes such as environmental hazards, tort liability, and the need to avoid regulatory scrutiny. Such sales are also used to obtain benefits for insiders and management.

In approving the sales, this court found the rapidly deteriorating condition of the properties and business exigencies merited the extraordinary relief. In addition, the court undertook an

The Debtor's estate received a total benefit of approximately $46.6 million including cash, assumption of liabilities, debt reductions, and novations from the asset sales. In addition, Lain, through Decker, Hardt's efforts, obtained a subordination agreement from Bank One, whereby approximately $11 million in debt was subordinated to all third party claims. At the time of the hearing on the sale, the Debtor's assets were appraised at approximately $10 million less than their ultimate sales price.

On October 31, 1989, WGM filed their combined Application. WGM requests the court to authorize compensation in an amount of $114,177.00 for the value of services performed on behalf of Stone and $195,965.00 for the value of services performed on behalf of Lain. A detailed summary of the legal services performed from June 21, 1989 through October 30, 1989 is attached to the Application. The Application requests reimbursement of $15,037.60 in expenses, and an additional $4,000.00 to cover the value of services and various expenses accrued but not yet ascertained at the time of filing of the Application. WGM requests a total of $329,179.60.

As discussed above, WGM's actions brought this exceptional case to a successful plateau.[7] The Application notes the severe time constraints WGM endured in rendering the following services:

(a) drafted the documents and instruments required to establish Stone as the CEO and business consultant for the debtor;

(b) determined the nature and the value of the Debtor's assets and evaluated the estate's legal rights *vis-a-vis* the assets, including their transferability;

(c) negotiated and mediated disputes between the venturers;

(d) advised Stone as to the status of the litigation between the venturers to the extent necessary to aid Stone's mediation process;

(e) negotiated and drafted a confidentiality agreement to bring the venturers to the bargaining table;

(f) obtained court approval for the sale of three option contracts from the Debtor's estate;

(g) assisted Lain, as trustee, in the general areas of his duties until the appointment and employment of general counsel;

(h) negotiated an agreement with Citicorp Real Estate, Inc. to provide emergency financing for the construction and maintenance of one of the Debtor's projects;

(i) negotiated a procedure for the sale of the majority of the assets of the Debtor's estate;

(j) prepared and filed a motion to establish procedures to maximize the sale of the assets;

(k) obtained an order from this Court establishing the procedure for the sale of the majority of the assets of the Debtor's estate;

(*l*) prepared, filed, and noticed two motions to sell substantially all of the Debtor's assets;

(m) obtained this Court's approval of the motions authorizing the sale of the Debtor's assets;

(n) renegotiated several of the terms of the sales and obtained approval of this Court of the revised terms;

(o) documented the sale of the Debtor's assets and closed the transactions.

WGM asserts that its total fee in this case is not greater than would have been charged by any other firm dealing with this representation "due to the efficient manner in which this case was handled." WGM notes that undue emphasis should not be placed on the billing rates of individual

---

extensive analysis of *Braniff,* finding that the sales did not lock in creditors. Finally, the court analyzed the seven *Lionel* factors, finding that Lain demonstrated cogent business justification for the sales.

**7.** This case is still being administered by the Chapter 11 Trustee to maximize the estate from claims objections and reductions. Counsel for the Trustee, Decker, Hardt, is evaluating estate voidable transfers actions. The Trustee is also pursuing certain estate actions against the venturers.

attorneys; rather "the focus should be placed on the total fee in relation to the work performed and the work product generated."

PCA objects to WGM's Application as "absurd." PCA notes that WGM seeks to destroy the customary fee structure in Dallas, Texas, by charging the estate hourly billing rates substantially in excess of the customary rates for professionals of similar experience. PCA also objects to the hourly rates of WGM para-professionals. PCA requests the court deny all fees requested, or in the alternative, deny compensation in excess of the customary hourly billing rates.

Partners also objects to WGM's rates because they exceed those charged for similar services in the community. Partners states "[T]he effect of the high rates is for WG & M to unilaterally provide itself a bonus without compliance with the standards accepted in the Fifth Circuit with respect to such fee enhancement." Partners requests that the court reduce WGM's fees to an appropriate rate based upon community standard.

The Trustee, Dan Lain, filed a comment to the Application pursuant to *Pierson & Gaylen v. Creel & Atwood (Matter of Consolidated Bancshares, Inc.)*, 785 F.2d 1249 (5th Cir.1986). The Trustee states that the legal services described in WGM's application were actually performed and necessary. Lain views WGM's fee structure as "reasonable" given "the firm's ability, efficiency, capacity, resources, and experience as demonstrated in this case."

The United States Trustee did not file comments on WGM's application pursuant to 28 U.S.C. § 586(a)(3)(A).

## II.

As this court has previously stated, "[O]ne of a bankruptcy court's least favor-ite duties is the enforcement of the Code provisions dealing with compensation of professionals. In dealing with these provisions, the Court is not likely to win any popularity contests. Yet, it is inherently the Court's duty to examine professional compensation, and to act where problems are discovered." *In re Kendavis Industries Int'l, Inc.*, 91 B.R. 742 (Bankr.N.D. Tex.1988). Attorney conduct and attorney billing practices involve different standards and different analyses. While this court's decisions in cases such as *Kendavis, supra, In re Michigan General, Corp.*, 78 B.R. 479 (Bankr.N.D.Tex.1987), *In re Michigan General, Corp.*, 77 B.R. 97 (Bankr. N.D.Tex.1987), and *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569 (Bankr.N.D. Tex.1986) touch on compliance with Title 11 in the context of attorney conduct, none deal with the analysis of compensation awards under 11 U.S.C. § 330 and the case law discussing the award of compensation.[8] This opinion addresses the reasonableness of an attorneys' fee application, and the standards to be applied by the Bankruptcy Judge in awarding professional compensation.

### A.

The Bankruptcy Code gives the Court the power to control the award of attorney fees. 11 U.S.C. § 330 (1988). Section 330 represents a departure from fee awards under the Bankruptcy Act, where section 241 governed professional compensation.[9] Policies of economy of administration and conservation of the estate were controlling factors in compensation under the Bankruptcy Act.[10] Trustees and attorneys were considered public officers and not entitled to the same compensation they could receive in private practice. Accordingly, pre-

---

**8.** Several members of the bar and commentators incorrectly view *Kendavis* and *Michigan General* as this court's disallowance of fees under general circumstances. These cases deal only with the court's power to enforce the bankruptcy code provisions regulating attorney conduct, and to limit or deny compensation where warranted because of breach of Congressional mandates.

**9.** Section 241 (formerly codified at 11 U.S.C. § 641) provided for allowance of "... reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred in a proceeding under this chapter."

**10.** *In re Manoa Finance Co., Inc.*, 853 F.2d 687, 689 (9th Cir.1988).

Code compensation meant fee awards in amounts at the "lower end of the spectrum of reasonableness." *In re International Horizons, Inc.,* 10 B.R. 895, 898 (Bankr.N. D.Ga.1981). *See also,* King, *Collier on Bankruptcy,* ¶ 330.02, p. 330–2–5 (15th ed. 1989). The system aroused fears that qualified practitioners would flee to more profitable areas of law.

Congress responded to the fear of practitioner flight and enacted a more liberal compensation scheme under the Bankruptcy Code.[11] Congress downplayed notions of economy of administration and provided that compensation in bankruptcy cases should be comparable to what is charged in nonbankruptcy matters. *In re Baldwin–United Corp.,* 79 B.R. 321, 346 (Bankr.S.D. Ohio 1987). *See also,* King, *Collier on Bankruptcy,* ¶ 330.02, p. 330–2–5 (15th ed. 1989). However, Congress did not intend to allow attorneys higher compensation than they would receive for comparable nonbankruptcy matters. *Manoa Finance,* 853 F.2d at 690.

The Bankruptcy Code gives only the most general guidance as to standards to be applied in awarding attorney fees to counsel for a debtor. Bankruptcy Code § 330 limits an attorney to reasonable compensation for actual, necessary professional services. The award should be based upon the time, nature, extent and value of the services rendered to the estate and the costs of comparable services. 11 U.S.C. § 330(a) (1988).

The case law has been informative in filling out the requirements for payment of professional persons in a bankruptcy case. The Supreme Court directs lower courts to make an initial estimate of reasonable attorney's fees by applying the prevailing hourly rates to the hours reasonably expended. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984) ("the initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate."). The Supreme Court further notes that courts may adjust the initial lodestar calculation by other factors such as those in *Johnson*[12] "but no one factor is a substitute for multiplying reasonable billing rates by a reasonable estimation of the number of hours expended on the litigation." *Blanchard v. Bergeron,* 489 U.S. ——, ——, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989).[13] Finally, the Supreme Court has ruled that the lodestar figure is strongly presumed to be a "reasonable fee" and that adjustments can be made in rare and exceptional cases supported by specific evidence. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986).

---

**11.** The legislative history to Bankruptcy Code § 330 evinces congressional concern with protecting the public interest in the smooth, efficient operation of the bankruptcy system by encouraging competent bankruptcy specialists to remain in the field. H.R.Rep. No. 595, 95th Cong., 1st Sess. at 329–330 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6285–6286.

**12.** *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). The factors include:

  1.  the time and labor required;
  2.  the novelty and difficulty of the questions;
  3.  the skill requisite to perform the legal service properly;
  4.  the preclusion of other employment by the attorney due to acceptance of the case;
  5.  the customary fee;
  6.  whether the fee is fixed or contingent;

  7.  time limitations imposed by the client or the circumstances;
  8.  the amount involved and the results obtained;
  9.  the experience, reputation, and ability of the attorneys;
  10.  the "undesirability" of the case;
  11.  the nature and length of the professional relationship with the client; and
  12.  awards in similar cases.

**13.** In a concurring opinion Justice Scalia laments the majority's "excessive preoccupation" with the *Johnson* factors in adjusting the lodestar calculation. The majority's decision appears to clash with the previously "acknowledged ... emancipation from *Johnson.*" *Blanchard v. Bergeron,* 489 U.S. at ——, 109 S.Ct. at 947, *citing, Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 563–65, 106 S.Ct. 3088, 3097–98, 92 L.Ed.2d 439 (1986).

The Fifth Circuit has adopted the Supreme Court's lodestar guidelines for fee awards in bankruptcy cases. *Lawler v. Teofan (Matter of Lawler)*, 807 F.2d 1207, 1211 (5th Cir.1987). In addition, the Fifth Circuit adheres to the *Johnson* factors as made applicable to bankruptcy proceedings in *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.1977). In applying the factors, the Fifth Circuit instructs courts to pay special heed to:

(i) the time and labor involved,

(ii) the customary fee,

(iii) the amount involved and the results obtained, and

(iv) the experience and reputation of counsel.

*Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575, 583 (5th Cir.1980). Finally, the Fifth Circuit has also instructed bankruptcy judges to explain the findings and reasons upon which the award is based, including an indication of how the *Johnson* factors affected the decision. *Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1206 (5th Cir.1981), *citing First Colonial*, 544 F.2d at 1300.

### B.

█ WGM attorneys and para-professionals expended a total of 1,530.90 hours for professional services on behalf of Stone and Lain. WGM's Application contains a detailed description of these services as well as an extended text extrapolated from the entries. The court's review of the Application and the parties' comments indicate that the services were actually performed. Moreover, the services were necessary for the successful resolution of that phase of this case. The time entries reflect adjustments in para-professional billings for file maintenance and trips to the courthouse. Although some of the entries reflect meetings attended by more than one lawyer, and some of the pleadings drafted by junior attorneys were reviewed by more senior attorneys, the duplication was neither unproductive nor excessive. WGM attorneys Feldman, Sosland, Hollander, and English recorded numerous "lumped" time entries "Reviewing Joint Venture Documents" on June 30, July 3 to 7, and July 24 to 27. The entries total approximately 68 hours. The entries generally explain why the review occurred but fail to explain why the review took so long. The court finds eight hours were unnecessarily duplicative and excessive. WGM attorney Haskel spent 1.1 hours on July 14, 1989, to "review potential conflicts and conference with Mr. Sosland regarding same." The court finds that this service was performed for WGM's benefit and provided no benefit to the estate and should not be charged. Following these adjustments, 1,521.80 hours constitute the total hours necessary and reasonable.

### C.

█ The next step involves determination of a reasonable rate. The Supreme Court has recently stated that a reasonable fee "is one calculated on the basis of rates and practices prevailing in the relevant market, *i.e.*, in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Missouri v. Jenkins*, —— U.S. ——, ——, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989). Fee awards in bankruptcy cases follow the same standards. *Matter of Lawler*, 807 F.2d 1207, 1211 (5th Cir.1987); *In re Yermakov*, 718 F.2d 1465, 1471 (9th Cir.1983); *In re Shades of Beauty, Inc.*, 56 B.R. 946, 951 (Bankr.E.D.N.Y.1986); *In re Temple Retirement Community, Inc.*, 97 B.R. 333, 342–43 (Bankr.W.D.Tex.1989).

WGM justifies their hourly rates as consistent with the rates charged by "national" law firms. WGM presented former Judge McConnell's affidavit to support its position. Partners argues "whether you call the law firm Weil, Gotshal & Manges a national law firm or not, you have to look at what the rates are in the community." Partners also compares WGM's average hourly rate in this case, $204 without adjustment, to Decker, Hardt's average rate of $116, and Jenkens & Gilchrist's average rate of $145. Partners suggests that $150 represents a reasonable average rate for WGM in view of the rates charged by other Dallas attorneys.

Mr. Lynn responds that WGM's rates are justified given the firm's attorneys have 600 years of cumulative experience and the extensive resources available to WGM.

In *Gulf Consolidated Services,* Judge Greendyke confronted a similar problem. The court concluded that the hourly rates charged by Debtor's counsel exceeded those charged by attorneys with similar experience and reputations, and therefore needed adjustments.

> While the cost of comparable services should not serve as an absolute cap on fees awardable to bankruptcy counsel, it is a factor susceptible of being given tremendous weight in the Court's discretion of making a determination of reasonable compensation ... It is this Court's perception that $250 per hour for legal services is a lot of money. As of the date of this writing such a degree of compensation can be and should be awarded only to lawyers of exceptional ability and expertise, for work of exceptional value.

*In re Gulf Consolidated Services, Inc.,* 91 B.R. 414, 420 (Bankr.S.D.Tex.1988). This court agrees that $250 per hour for legal services is a lot of money and should be awarded to lawyers of exceptional ability and experience for necessary services.

The court is familiar with the levels of experience and reputations of many of the WGM attorneys in this case. Each attorney possesses different strengths and areas of expertise. Some WGM attorneys perform better in contested hearings, others are more adept in negotiating settlements, and others excel in document drafting. Attorneys develop these skills over time in the community (or communities) where the attorney practices. Moreover, an attorney usually develops a reputation over time in the community (or communities) where the attorney practices. In cases where an attorney lectures at continuing legal education seminars, authors law review articles or treatises, becomes specialized in a particular field of law, and participates in bar activities, the attorney may develop a statewide or regional reputation. Although WGM's rates are consistent with those charged by "national" law firms, WGM attorneys performing services for Stone and Lain were all local. Moreover, WGM is a local law firm with Dallas offices, and paying Dallas rents, utilities, salaries and other overhead.

WGM's senior attorneys, with hourly rates between $275 and $285, have practiced bankruptcy and real estate in Dallas for approximately 15–18 years. One of these attorneys has co-authored various treatises, participated actively in bar association activities, and participated as a speaker in continuing legal education programs. Dallas bankruptcy attorneys with similar years of experience, with greater and lesser reputations, and with greater and lesser practice expertise charge their clients hourly rates between $200 and $250. The hourly rates for senior WGM attorneys should be adjusted to reflect the prevailing community standards. The fact that senior WGM attorneys traveled to Chicago and Tulsa, and the further fact that the Venture owned properties in six different cities, neither elevates this case to one of "national" significance or concern, nor should it elevate the rates charged by senior WGM attorneys. Accordingly, the court finds $250 as a reasonable hourly rate for certain senior WGM attorneys.

WGM's junior attorneys, with hourly rates between $135 and $225, have practiced bankruptcy and real estate in Dallas between one to five years. Some of these attorneys have served as judicial law clerks, and a few have co-authored articles for continuing legal education programs. These attorneys have primary responsibility for (a) researching and drafting pleadings reviewed by more senior attorneys, (b) reviewing source documents and writing memoranda to senior attorneys, (c) preparing pleading binders for hearings, and (d) presenting uncontested motions and orders. Dallas bankruptcy attorneys with one to ten years of experience, and with similar practice expertise, charge their clients hourly rates between $80 and $195. Dallas attorneys with six to ten years experience often handle contested proceedings, lead settlement conferences, develop firm clients, and participate as speakers at con-

tinuing legal education seminars. The same is not true for WGM's junior attorneys although their hourly rates uniformly exceed those charged by Dallas practitioners with more experience. The hourly rates for junior WGM attorneys should be adjusted to reflect these differences and meet prevailing community standards. Accordingly, the court finds $85 to $175 as an index for reasonable hourly rates for junior WGM attorneys.

WGM's para-professionals are billed at hourly rates between $30 and $90. The Application does not explain the differences in hourly rates. The compilation prepared by Mr. Jillson reflects para-professional hourly rates between $25 and $60 as the prevailing community rate. The time en-

tries by the WGM para-professionals reflect services such as (a) preparing pleading binders, (b) travelling to courthouse to file pleadings, have orders entered, and review docket sheets, (c) maintaining files, (d) distributing documents, (e) reviewing mail and intraoffice memoranda, (f) travelling to airport to notarize documents, and (g) reviewing documents. The court views the services performed as ministerial in nature rather than a substitute for attorneys' services. Accordingly, the court finds that the hourly rates should be reduced to reflect the prevailing community standards.

The following charts set out WGM's rates before and after the court's adjustments.

| Attorney | Year Admitted | Rate Per Hour | Total Hours | Amount |
|---|---|---|---|---|
| West | 1978 | $250 | 2.30 | $ 575.00 |
| Hartman | 1985 | 210 | 6.70 | 1,407.00 |
| Orshan | 1989 | 130 | .40 | 52.00 |
| Feldman | 1973 | 285 | 279.00 | 79,515.00 |
| Lynn | 1972 | 275 | 167.60 | 46,090.00 |
| Nanninga | 1986 | 175 | 15.60 | 2,730.00 |
| English | 1984 | 175 | 258.80 | 45,290.00 |
| Sosland | 1984 | 225 | 159.90 | 35,977.50 |
| Hollander | 1985 | 195 | 14.50 | 2,827.50 |
| Berryman | 1988 | 135 | 3.30 | 445.50 |
| Kinz | 1988 | 135 | 44.70 | 6,034.50 |
| Mottern | 1984 | 215 | 112.70 | 24,230.50 |
| Haskel | 1975 | 225 | 3.20 | 720.00 |
| Youngman | 1985 | 195 | 54.30 | 10,588.50 |
| Garner | 1983 (Ohio) 1987 (Tex.) | 155 | 7.50 | 1,162.50 |
| Lauria | 1986 | 175 | 185.50 | 32,462.50 |
| Averch | 1984 | 195 | 13.30 | 2,593.50 |
| Berman | 1984 | 230 | .40 | 92.00 |
| | | | 1,329.70 | $292,793.50 |

| Attorney | Year Admitted | Adjusted Rate Per Hour | Adjusted Total Hours | Adjusted Amount |
|---|---|---|---|---|
| West | 1978 | $200 | 2.30 | $ 460.00 |
| Hartman | 1985 | 150 | 6.70 | 1,005.00 |
| Orshan | 1989 | 80 | .40 | 32.00 |
| Feldman | 1973 | 250 | 277.00 | 69,250.00 |
| Lynn | 1972 | 250 | 167.60 | 41,900.00 |
| Nanninga | 1986 | 125 | 15.60 | 1,950.00 |
| English | 1984 | 135 | 256.80 | 34,668.00 |
| Sosland | 1984 | 140 | 157.90 | 22,106.00 |
| Hollander | 1985 | 135 | 12.50 | 1,687.50 |
| Berryman | 1988 | 85 | 3.30 | 280.50 |
| Kinz | 1988 | 85 | 44.70 | 3,799.50 |
| Mottern | 1984 | 140 | 112.70 | 15,778.00 |

| | | | Adjusted Rate Per Hour | Adjusted Total Hours | Adjusted Amount |
|---|---|---|---|---|---|
| Haskel | 1975 | | $175 | 2.10 | $ 367.50 |
| Youngman | 1985 | | 130 | 54.30 | 7,059.50 |
| Garner | 1983 (Ohio) | | 125 | 7.50 | 937.50 |
| | 1987 (Tex.) | | | | |
| Lauria | 1986 | | 125 | 185.50 | 23,187.50 |
| Averch | 1984 | | 125 | 13.30 | 1,662.50 |
| Berman | 1984 | | 140 | .40 | 56.00 |
| | | | | 1,320.60 | $226,187.00 |

| Paralegal | Rate | Total Hours | Amount |
|---|---|---|---|
| La Rosa | 90 | 48.70 | 4,383.00 |
| Bailey | 80 | 1.70 | 136.00 |
| Davis | 70 | 9.70 | 679.00 |
| Scott | 90 | 83.80 | 7,542.00 |
| Winters | 80 | 6.50 | 520.00 |
| McKie | 85 | 46.90 | 3,986.00 |
| Morrone | 30 | 2.70 | 66.00 |
| Hood | 30 | 1.20 | 36.00 |
| | | 201.20 | $ 17,348.00 |

| | Adjusted Rate | Total Hours | Adjusted Amount |
|---|---|---|---|
| La Rosa | 50 | 48.70 | 2,435.00 |
| Bailey | 50 | 1.70 | 85.00 |
| Davis | 50 | 9.70 | 485.00 |
| Scott | 50 | 83.80 | 4,190.00 |
| Winters | 50 | 6.50 | 325.00 |
| McKie | 50 | 46.90 | 2,345.00 |
| Morrone | 30 | 2.70 | 81.00 |
| Hood | 30 | 1.20 | 36.00 |
| | | 201.20 | $ 9,982.00 |

## D.

■ The court now considers whether WGM is entitled to enhancement of the lodestar. The Supreme Court presumes the factors (a) novelty and complexity of the issues, (b) special skill and experience of counsel, (c) quality of representation, and (d) results obtained, are included in the lodestar and cannot serve as independent bases for enhancement of the lodestar. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986); *Blum v. Stenson*, 465 U.S. 886, 898–900, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984). Enhancement is warranted in narrow circumstances, because when an attorney enters into an engagement:

> he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his post-engagement performance.

*Delaware Valley*, 478 U.S. at 565–66, 106 S.Ct. at 3098. However, enhancement may

be warranted if the applicant shows specific evidence that the lodestar does not fully reflect the factors.[14]

Although the first stage of this case proceeded rapidly, and required some of WGM's attorneys to give up their Fourth of July holiday and weekends, this case represents a partition between acrimonious venturers. Although the hostility between the venturers made matters difficult, the legal questions involved in this case were no more difficult than questions in other real estate bankruptcy cases. WGM's attorneys demonstrated levels of skill and experience similar to that of other Dallas, Texas attorneys. Likewise, the results obtained were similar to those that might have been obtained from other Dallas, Texas attorneys. The court commends WGM for performing to the best of its abilities, but that is what is expected of all professionals. When WGM accepted these engagements, it became obligated to carry out its representation with the high standards the public expects of attorneys. Because attorneys function in a self-regulated environment, they must continually strive for high standards to maintain public confidence. The lodestar alone rewards attorneys for their services. Rewarding an enhancement for something already required is therefore unnecessary. For these reasons, the court holds that an adjustment to the lodestar is not justified.

### E.

WGM's application requests reimbursement for document processing and weekend utilities. These expenses constitute overhead expenses incurred on a day-to-day basis not subject to reimbursement. *See In re S.T.N. Enterprises, Inc.* 70 B.R. 823, 844 (Bankr.D.Utah 1987) and *In re Cumberland Bolt & Screw, Inc.*, 44 B.R. 915 (Bankr.M.D.Tenn.1984). Accordingly, the court disallows the $90 expense for utilities

and $1,818 in document processing expenses.

F.2d at 691–92; *Baldwin–United,* 79 B.R. at 347–51.

---

**14.** *Delaware Valley,* 478 U.S. at 564–69, 106 S.Ct. at 3098–3100; *Blum,* 465 U.S. at 898–901, 104 S.Ct. at 1548–50. *See also Manoa Finance,* 853